Medina says you've got no probable cause. You've got no charges. Who are you? You've got nothing. That's what Detective Caputo told Sgt. Rydell after talking to the state's attorney while they were holding Mr. Ulmer at the police station and telling him he couldn't do it. They did in fact tell him that he had to wait at the police station until the police chief arrived. He asked more than once could he leave. Officer Ruffin also testified that he ignored Mr. Ulmer's questions several times when Mr. Ulmer was asking, but ultimately, yes, they did tell him he had to stay. My recollection is that they said they were trying to complete the paperwork and that the chief wanted to speak to him so they asked him to stay until the chief arrived and they completed the paperwork. That's a little different than saying you cannot leave. The paperwork comment was early on. That's Officer Ruffin. And that was Officer Ruffin's testimony while he said he was essentially ignoring the question but ultimately said I'm completing the paperwork. After the field tests that Officer Ruffin gave, after he passed the field tests, after Detective Caputo asked Mr. Ulmer if he would take a blood test and Mr. Ulmer refused and said on the advice of his attorney he wouldn't take a blood test, at that point Mr. Ulmer more than once asked can I go home? When can I leave? And their answer was not until the chief gets here. The chief wants to talk to you. That is you have to stay. No reasonable person would think that they could say well I'm not waiting for the chief. I'm leaving this police station. I'm going from here. I think it's clear at that point that they are holding him there and it's three and a quarter hours essentially that they make him stay and wait there. And I would also submit that the evidence at the motion and the trial shows that while Mr. Ulmer was walking around the police station early on pacing, he was still kept in the police station. He wasn't free to leave and they explicitly told him that. But more importantly again after the field tests that according to Officer Ruffin he's passed either he passed and after the refusal he is sitting in that interview room and that's where he is three and a half hours or three hours later when the chief comes in, sits down next to him and then notices what the chief, the chief testifies he notices things that none of the other officers noticed. Did he walk in and out of that room without escort? He was walking in the police station in the lobby and in that room for a period of time and I think the record shows that that was prior to the field tests, prior to the request to take the blood test that he refused and that after that he was not freely walking around. Did someone tell him he couldn't walk around? No I don't believe there's any evidence that anyone told him he couldn't walk around. So he's not restrained in that room, he's walking around in that room in and out freely and no one ever told him he couldn't leave? He's walking around in a police station where he's been told he has to go because that's not where he wanted to go. He asked if he could leave, they told him the only place he could leave the scene from was to go to the police station in an escort and he is in the police station under surveillance at all times and so the fact, my position would be Judge, as the, your honor, as the fact that he was not handcuffed is not dispositive of the question, the fact that he wasn't physically stranded. Right, my point would be that it is in a police station, it is not as if he's free to walk around. So people who are allowed to walk around freely in police stations should assume that they're under arrest? He's not in the lobby, he's allowed to walk into the lobby at some point, but he is being interrogated and questioned and the subject of an investigation where they're specifically asking him to perform a field sobriety test and take a blood test inside the police station. And as I said, he's been taken there, he's been told he can't go there on his own, and he's under escort and observation the whole time. I think that's a significant fact. This car wasn't drivable, that's not clear from the record, but I don't remember seeing anywhere where Mr. Omer said, I'm going to call someone to come and pick me up or I'm going to call my wife or whomever to come and pick me up. There was nothing like that. What they told him at the scene was that if he wished, he could accompany them from the scene to the police station, but not on his own, they couldn't meet him there or anywhere else. Well, there was a reason for that, a legitimate reason. Along that stretch of Route 62 and 59, there's no sidewalk, and the police officer said they wanted to avoid another accident. It's just roadway and then the embankments. So they told him he couldn't walk that distance. And that makes sense. But at any time, did Mr. Omer ever ask, okay, I'm very shaken up, my car isn't drivable, can I get a family member to come or a friend or someone? Well, he does ask, as I said earlier, to leave the police station. He asks, when can I go home? When can I leave here? Because they're telling him he has to wait. My question is very narrow and different. Did at any time did Mr. Omer ask to call someone to come and pick him up? I know that the record reveals that his wife is out of town. I don't believe that there's any evidence in the record that anyone denied him from calling anybody to come pick him up. I don't know if there was anybody at that moment to come pick him up. But I do know that the police told him, and it's reasonable, I think it would be reasonable for any citizen under the circumstances to believe that initially they would have to remain to provide information. The police were investigating on the scene. And I don't disagree that the officer is saying, look, we're going to have to drive you. You can't walk to the police station. I think the critical fact, though, is that you have to come with us to the police station, not can we take you somewhere else? Can we take you to the toad place? Can we allow you to do anything else? It was very specifically to continue the investigation. They were completing paperwork. Two people had just been killed. I mean, to take him to a toad facility to complete the paperwork. I'm saying that they are purposely keeping him at the police station to continue to conduct this investigation. It's not inadvertent. It's your spin on it. I understand that. But the fact is, do me a favor. Distinguish people versus Williams. Tell me how your case is different than Williams. He voluntarily goes to the police station. He offers to walk there. When he gets there, they don't handcuff him. They put him in a room. They allow him to come in and out of the room as he pleases. And it's not until he has a conversation with the chief that they tell him he's under arrest. In fact, he asked once if he was under arrest. He was told specifically he wasn't under arrest. The difference is they did not invite him to the police station. They told him that's where he needed to be. But they didn't tell him he needed to go there if he was under arrest. They told him they had to do paperwork. I disagree because immediately, and I mean immediately, Detective Caputo and Sergeant Rydell and Officer Ruffin are immediately discussing what do we have to do to make him take a blood test. Go ask him to take a blood test. Document that he's refusing the blood test. This is not a situation where they've just invited him to come along. They are explicitly focused on him. They're explicitly focused on a DUI or a reckless homicide investigation. That's the difference. He's not, because of how this starts and because of where they take him and because of how it then progresses, that's the difference in Williams. Before you run out of time, I'd like you to pass on to the issue of the redaction of certain portions of his statements. Specifically those portions of his statements that dealt with his alcoholism and his AA meetings. There are, focusing specifically on those statements, this is part of the state's functional alcoholic theory, if you will, and it was the corner piece of their entire closing argument, essentially to inject in front of the jury repeatedly, this is an alcoholic. He has experienced, the specific quotes in rebuttal are extreme. He knows how to refuse to give blood. This is a functioning alcoholic. He talks about absorption of alcohol. Who talks like that unless it's something he's experienced with? He thought as an experienced drinker that he could pass. These are comments that the state made in rebuttal closing. Don't let this guy out of here. I'm not worried about the comments right now. I'm worried about the evidence. What did they introduce in relation to his prior alcoholism and his treatment at AA? That he had an alcohol problem, that he admitted he had an alcohol problem, that he had gotten treatment, that he had a counselor that he was continuing to see. In fact, that's on one of the videotapes. When they go back to the search, he's asking if he can get his counselor's number. All that conveys to the jury that this is a man who has an alcohol problem. He was an alcoholic. The problem with that evidence, as I was just saying, is that it leads one to the conclusion that, since we all know that alcoholics can't control their drinking, this is a likely situation here, and that's improper evidence, and it was argued explicitly by the state in the rebuttal close. None of that should have come in. Please, what type of evidence is this? Is it character evidence? Character evidence is inadmissible. As is habit evidence. Is he habit evidence? It's argued essentially as both. The implicit, the underpinning to the state's rebuttal argument, and it's in their regular closing argument, is that the jury should take that as evidence, that it is more likely that this morning he got up and drank an extreme amount of alcohol and got behind the wheel of a car. That is what they argued it for. It is the linchpin of their argument, and it's not supported. I would spend too much time talking about how this concept of medical tolerance to alcohol... What was the basis of your objection to the evidence before the trial? As to the statement that it was character evidence, that it was improper character evidence... You objected to it as character evidence as opposed to habit evidence? It was improper character evidence and habit evidence. You've got to let me answer the question. Okay. Take it easy. What was the basis of your objection? What did you say to the judge when you said I object? It was a limiting motion, and the arguments in the limiting motion were that it was not relevant, and that it constituted improper character and habit evidence. That was argued to the trial judge. I would have to pull the motion to explicitly read you what... Because the state says you did not object on the basis of habit. Actually, I believe in the argument they referred to it interchangeably as character and habit evidence. How did you refer to it when you objected? What was the basis of your objection? Was it relevance? It is both. Were you objecting because it was irrelevant, or were you objecting because it was improper character evidence? It's a big difference. I think the argument they were making is both, and that it should not have been... No, I'm asking you what you... Oh, the argument that I'm making, we're making both arguments, that it is... What did you say before the trial court? Not here. When you objected in the trial court, what was the basis of that objection? The basis for that limiting motion in the trial court was that the material wasn't relevant, that it was overly prejudicial, and that at oral argument, the argument to the trial court was that it constituted improper character evidence. Could I give you a minute to respond to something, and then I'm just going to read you something from your brief, and then you can comment if you like. This is in the section about the sentence, and you argue that this was an excessive sentence. You say Harold Ulmer had no felony or other criminal convictions. Though he had previously been charged and found guilty of DUI twice, both offenses having occurred since 2004, within three years of the event. Do you want to comment on that? He had no criminal convictions? He's been twice convicted of DUI? That's not a criminal conviction? It is a criminal conviction, and that's inaccurate language. It's, from my experience, representing people charged with murder and on the level. Essentially what that argument is to point out is that he did not have a criminal past. He does not have a past that would show him. I mean, you say, one whole argument. You spend a lot of time here saying this is an excessive sentence. This is a death sentence for this man. He's 62 years old. You have a lot of passion in this argument, but you start by saying he has no convictions, except two DUIs within three years of this case. He has two misdemeanor convictions. It would have been more accurate to have said no felony convictions. I meant the word criminal to refer to acts of criminality that would reflect more specifically on a criminal character or someone who had a complete lack of respect for the law or something who didn't suffer from a medical problem or a disease that contributes to the offense. I think you're digging yourself a deeper hole. DUIs are criminal convictions. I mean, it's very clear that the legislature has addressed them as such. This argument is in the context of sentencing, and you're, as I say, rather critical of the court and its use of statutory factors in aggravation mitigation. However, you seem clearly overstated. Would you agree with me there? Yes. That he has no criminal convictions and that, therefore, that the court certainly could have taken into consideration the fact that he had two DUI convictions within the last three years before this event. No, and I did specifically mention that he had these DUI convictions. The distinction, as I said, should have been more the language is imprecise in the sense that it does not distinguish between felony criminal code convictions. This is a conviction under the vehicle code. It is a misdemeanor offense. It is a criminal conviction. At least the second offense would have been a criminal conviction, assuming that he got supervision and it wasn't revoked the first time. There's no question about that. Would it be appropriate for the court to consider that those two DUI convictions occurred within three years of this reckless homicide based on a felony conviction? Oh, certainly. I didn't mean to suggest that that was somehow improper of the trial court to have not considered that. The distinction, as I said, I was trying to make is that other than his alcohol problems, other than the DUIs, which are reflective of the fact that the man has a serious alcohol problem, that there is no other evidence of criminality. I think it's just something else about respect for the law. Right. There's nothing else in his background that would lead one to believe that this is someone for whom a sentence close to the maximum sentence would be appropriate and in the range. And so, as I said, I do certainly apologize for not being more precise in the language. I did not in any way mean to suggest that those DUIs aren't significant in the sentencing scheme. What's the potential sentence for aggravated DUI? It is the top end, I believe, is 28 years. I would have to go check that right now. That's just less than half the man. Yes, I believe that is right. Morning, Your Honors. Morning. Assistant State Attorney Douglas Harbath on behalf of the people of the State of Illinois. With regard to the first issue regarding probable cause, I'd like to read something briefly from the transcript. In his own words, in his own motion to quash arrests and suppress evidence, he testified that the officer asked me would I like to be transported from the scene. And I think that sums up the issue regarding, at least chronologically, his transportation from the scene. He couldn't put it better. I couldn't put it better myself in terms of characterizing this as something that's utterly voluntary. And I think it's appropriate. Read the rest of that. The answer, question, what did Officer Ruffin say to you? Answer, it wasn't Officer Ruffin. It was a white officer, excuse me, that said whether I would like to be transported from the scene. Question, and did he tell you anything else? Answer, he told me I wasn't going to be under arrest and I wasn't going to be handcuffed. Question, and did you make any offers or suggestions at that time when he said that to you? Answer, no. Question, did they tell you where they were going to take you? Answer, to the Barrington Hills Police Department. So they were going to transport him from the scene. When you read that first part, you made it sound like he wanted to be transported home or to work or someplace else. It was very clear, because I read that as well, that what they were asking him is whether they wanted him to, whether he wanted to be transported to the Barrington Hills Police Station or to some other police station, which is entirely appropriate. I just think it's a little bit misleading to suggest that somehow they were offering to drive him somewhere else. They were offering to drive him to the police station. Absolutely. And I think that that's clear from the record. I would not disagree with you. Absolutely. They offered to take him to the police station. I think an understanding of the chronology is very important. The defendant's own witness, his first witness at that motion was one of the paramedics who, after reviewing his report, specifically said that he was with the defendant from 9.04 in the morning to 9.40 in the morning. Mr. Horvath, let me ask you something. Do you think that an ordinary person, a reasonable citizen, if you're in a police station after you've just been involved in a massive automobile accident where two people were, we knew at least, he knew that at least one person was killed because they covered the guy with a sheet right there on the ground, so he saw that. They transported the female to a hospital, so maybe he didn't know, but he knows that at least there was at least one fatality. The police then took him to the police station and said, we would like you to stay here until our chief comes. Do you think he really thinks that he was, that he really thought he was free to leave, that he could just say, you know, I really don't want to stay here. I'd like to leave. Does that seem reasonable to you? Well, I think because the inquiry is what would a reasonable innocent person under the circumstances feel, whether or not that person was free to leave. And, of course, the defendant's own testimony is that, yeah, I felt I couldn't leave. I felt I had to stay here. But the inquiry is not what this particular defendant subjectively felt. Right. That's why I'm asking you. What I have felt? No, what do you think a reasonable innocent person under similar circumstances, that's what the whole issue is. And I know what you said in your brief, but I'm asking you to articulate, to flesh it out a little bit for us. Okay. I think based on the facts of this case, the transcripts, and I assume you've read them, they're very thick transcripts of this, very lengthy. If it shows nothing, it shows that this defendant was cooperating from the first minute he had contact with a paramedic to the time that the handcuffs were placed on him. But that's not indicative. The fact that he was cooperating, what is that indicative of? Well, I think that's in, I believe it was Justice Hoffman referred to the Williams case. What the Supreme Court said in Williams was that, and I guess the best is to quote, to hold that such initial questioning is tantamount to arrest, would hold that any station house interrogation is necessarily custodial as to indicate that the person questioned has been placed under arrest. That would mean that the police could not request presence of anyone, even for non-custodial questioning, unless they had probable cause to arrest. And we see no reason to restrict the investigatory function of the police. I think that applies perfectly to this case where they had this person, and I'd like to point out that he was in contact with the police all of 75 minutes before the chief noticed that he had an odor of alcohol. This isn't like some of the cases that you read or this court has had occasion to decide where it's 12 hours, 24 hours, 36 hours, 48 hours where the person is cooperating, and it's maybe a stretch to use that word under those circumstances. But in this case, he's at the police station at about 10 o'clock. He's asked to leave. I mean, excuse me, he's asked to stay there for the police chief while they do some paperwork. I mean, let's not forget that this is, as you indicated, Justice Cunningham, this is a double fatality. Paperwork is going to be monumental. For them to have completed their paperwork and given the defendant his license back and ushered him out of the police station would have been completely unreasonable. I think an hour and 15 minutes is on a very short end. But the length of time wasn't my question. My question had to do with are you really saying that under the facts and circumstances of this case, this defendant or a reasonable person would feel, I'm free to leave, although they told me I have to wait for the chief. I can say, no, I don't want to wait. I'm leaving. I think it's in light of there's many, many factors, and they're listed in the briefs, whether or not a reasonable person would have felt. I guess that's a question. First of all, it's a question of fact for the trier of fact. And the judge in this case found, and we quoted at length his ruling, Judge Fekirada going on and on and on, saying that he was there voluntarily. And I guess I would take exception to counsel's characterization of the defendant being told by the police, you must stay, you must stay. I don't think that's fairly characterizing. I think your Honor, Justice Cunningham, actually pointed out that that wasn't exactly the language. Sit over there and keep your mouth shut and wait until the police shows up, until the chief shows up. They did tell him at least three times, maybe more, but I count at least three times that he had to wait for the chief because the chief wanted to speak with him. Isn't that so? Well, I guess it is a matter of semantics, telling him to wait, asking him to wait. And the police, I mean, the defendant testified to one thing, and the detectives and the police testified to something a little bit different, saying that they asked him to wait. And the trial court ruled against the defendant on his motion. He found that he was completely incredible, the least of which reason was that he lied about having consumed alcohol. So he even made a credibility determination against the defendant, and he took that into consideration in denying the defendant's pretrial motion. There's just so many indicia that point to this not being an arrest. And I'm not going to belabor them, but he was not handcuffed. He was not Mirandized. The weapon was never brandished. Even when he was sitting in the police car at the request of the paramedic, not the police, the police didn't say, go sit in my car. It was the paramedic for his safety. We've got a very gruesome crime scene. Police go sit in the, if you'd be more comfortable, sit in the police car. And he did, and he sat there with his feet on the pavement, so the door wasn't even closed. Well, I don't think anybody's alleging that he was under arrest at that time. It's in the police station that that's their argument. But, you know, I know what your position is. Can you address the question of the search warrant, the consent to search versus the threatened search warrant and the damage to his property if he didn't consent? Yes. The consent in this case was it was voluntarily given. There was no threats, no coercion, no intimidation whatsoever. When the cases use those languages, they speak to people who have actually been threatened, sign this or else, with the threat of physical violence. And I'm not saying that it couldn't, under some circumstances, involve a threat to intentionally damage an individual's property, although I will point out the defendant hasn't cited any cases that support that. But in this case, there wasn't even that. There wasn't even a threat to intentionally damage his property. The actual language they use is there might be some damage going in. So why mention it? The trial court found that the officer's statement that if they had to get a warrant, there might be damage to the defendant's house, and, well, that wasn't a threat. It was just what? Well, just like informing, the language that the cases use is the police may inform an individual of something. It's simply informing them, for example, that they will obtain or they can obtain or that they intend to seek a search warrant. Informing them of that fact doesn't vitiate consent. Well, the fact of the matter is if they obtained a search warrant, there would have been damage to his house because it would have broken through the front door. They did nothing but tell him the truth. And I think that's entirely accurate. A search warrant, and I'm not saying search warrants always involve officers. Well, they have to get in. They have to get in. And they have no key. So the only way to do that without a key and without the consent of the person they're asking for consent from. Can you talk to me a little bit about all this testimony about his alcohol dependence, his drinking habits, the details of his treatment with AA? How is that admissible? Well, first of all, I think it can't be forgotten that this is the defendant's own words. This is the defendant's statement. It's his confession. No, I understand that. So the reason I point that out is because this isn't a situation where, well, could the state call a witness to the whole? The state introduced the statement. Is that right? Well, it was play. I mean, it was published. Yeah, but it was the state's evidence. Absolutely. Didn't they find a motion limiting to redact this for these portions? They did. The defense did. And what was their theory? The irrelevant. It was irrelevant. It basically was unduly prejudicial, I think. They did. But my question to you is, what theory allows that type of evidence in a case like this? In this case. Is it character evidence? It's not character evidence. Is it propensity evidence? It's absolutely not propensity evidence. Is it habit evidence? Even if it is habit evidence. Well, is it? No, it's not. It wasn't. If I could just expound on that. Habit evidence would be to show that an individual has done certain things in the past and he acted in conformity on this occasion. There was no issue in this case whether or not he drank that wine. It's a little more. Habit evidence, it would have to rise to the level of reflexive behavior. It's not just that he has behaved that way in the past. It rises to the level of reflexive behavior because of his past conduct. There's nothing in here that would establish habit, is there? Absolutely not. Okay, so what is it? It seems to be circumstantial evidence of propensity to prove that because he drank heavily in the past, he obviously drank heavily on this day. What this evidence established was that the defendant, he can handle his liquor. He has a high tolerance. He has an ability to mask the effects of alcohol, and that's why he was allegedly passing these field sobriety tests, that he can handle his liquor. That's not propensity, and it's not habit evidence. When did you introduce this evidence? Did you introduce this through rebuttal? No, it came out in his statement. It was introduced in my case in chief. Your case in chief. So you're not introducing this evidence to rebut the testimony of this expert, that talks about how he blows a 1.0 something three hours later, so he extrapolates back and whatever he came up with for a theory. But this was introduced in the state's case in chief. What were you attempting to prove by this in the state's case in chief? Well, because the whole issue was intoxication. Right. And the state was well aware, and this was not. You had the blow. Yes. You had the testimony of Chief Murphy. Is that his name? Yes. Chief Murphy. If this isn't circumstantial evidence of character, used to support the inference that he acted in a specific way on the date of the occurrence, I don't understand what it is. Well, it wasn't any secret that the defense was going to be that he wasn't drunk yet. That was the whole defense. And the state knew that the defendant was going to call an expert, had hired an expert, and was going to testify that the alcohol had not absorbed yet. So any evidence that would tend to disprove that would be entirely wrong. You introduced that in your case in chief. You don't know. I mean, you are surmising what he was going to use as his defense, so you decided to rebut it before he used that as his defense? I mean, I'm like Justice Hoffman. I'm still trying to figure out what is it that that evidence was used to prove. Because, like I was saying, the issue was intoxication and whether or not the defendant, having ingested a large amount of vodka at about 830 in the morning, was still drunk at 9 o'clock in the morning, thereabout, and whether or not he had absorbed into his system in his own statements that he's a functioning alcoholic, that he has an alcohol problem, that he drinks and he only drinks vodka, and this is how he drinks his vodka. He corroborated his own statements. But you're attempting to prove that he was drunk at the time of this accident. The fact that he was an alcoholic, the fact that he went to AA, does that go to prove that he was drunk at the time of this accident? It goes to his ability to handle his liquor. And the issue of absorption was the center point of the expert testimony at trial. And whether or not this defendant drank enough to actually be drunk at the time of the collision, which was shortly before 9 o'clock. Can I say this? I had a couple of timing questions. There was evidence in the case in chief from officers, paramedics, others, that they noticed nothing unusual about him. That's correct. That he didn't swear speech, he didn't stagger, they didn't smell liquor on his breath. So in your case in chief, there was evidence that a number of people observing him did not notice anything unusual about him, correct? That's correct. Okay. So my sense is that there was something there that the state was trying to then try to explain that, right? Why all these people who saw him right around the time of the accident did not make a judgment that he had been drinking. And it's definitely relevant for that purpose, that his outwardly innocent-seeming behavior, no indication of intoxication, can be explained by his own statements in his statement where he says that. And that's what I want to ask you about. How are those two things linked up? Was there some kind of evidence to show that a person who has had, maybe a diagnosis or whatever, is an alcoholic over a long period of time, is able to consume a greater amount of alcohol and that exhibits certain kind of characteristics? Was there anything linked up, this testimony that you're trying to rebut and his testimony, his statement? Well, that came out through the state's expert. The state's expert actually testified at length to an alcoholic. They actually used the word functioning alcoholic and their enhanced ability to mask, I think was the word he used, mask the effects of alcohol. So this evidence came in not only through the defense confession. There's also this type of evidence from the state's expert linking those two things up. Absolutely. I would say they went hand in hand. His own statement that he's a functioning alcoholic and that he only drinks vodka and then the state's expert that actually testified that vodka has a peculiar ability to not be detected. It doesn't have an odor and things of that nature. So that's the defendant saying that he only drinks vodka. Then you have the state's own expert saying, well, let's explain vodka and how that appears and also talking about how a functioning alcoholic can mask the effects of intoxication. I think it's also important that the trial court is not obligated to sanitize a defendant's confession. So while this was a lengthy confession, it did go on for approximately 100 pages, it's not the trial court's obligation to sort of sanitize that, to kind of make it an even playing field where the jury doesn't get to hear certain things just because they came out of the defendant's mouth. In this case, it would have required, I mean, the argument could be made on any number of issues that that should be taken out, kind of cherry picking things that have to be taken out. This is highly prejudicial evidence. In a case where we've got aggravated DUI with two deaths, the question becomes, assume for a minute, let's assume for a second that somehow this evidence is relevant. We've got to pass a second verdict. You don't think this is so overly prejudicial that it detracts the trial court from the question they had to decide, and that was, was he drunk at 9 o'clock on the morning of this incident, as opposed to the fact he's just a bad guy that drinks a lot. Well, I think the, well, first of all, there's another case decided by this court, which is also called Williams, simply because evidence is prejudicial. No, no, just because it's prejudicial doesn't mean it's out. Right. Does the prejudicial value so outweigh the probative value that it distracts the trial from the issue they're to decide? You've got a guy, you've got two deaths, and you've got a man charged with driving under the influence of alcohol. So you parade in an entire history of alcohol abuse in the past. I mean, if a man's on trial for robbery, do you think we're going to let the state introduce all sorts of evidence that he committed four prior robberies? That certainly would arguably go to propensity. In this case, there's no propensity because there was no issue whether or not he drank that morning. He admitted to it. It's on video that he admitted he drank. The state wasn't introducing this part of his statement to prove that he drank on this day, that he can mask the effects of alcohol. So why is that relevant? Because the whole issue was intoxication at the time of the crash, based on extrapolation. Obviously, the breathalyzer wasn't until some time later, so that's why the expert testified to opine what the blood alcohol content was at the time of the crash. So the issue was retrograde extrapolation, whether or not it had dissipated, whether or not it had absorbed yet. So I think it goes directly to that issue, whether this person's anatomy is such that would allow him to mask the evidence of intoxication, whether or not he could be a functioning alcoholic. So the whole history about his seeing a counselor and all of that, that all goes to the extrapolation theory that you're talking about. Whether or not he was seeing a counselor and other minor, arguably tangential issues were utterly harmless. This isn't a situation where this jury hearing this evidence... But was it not cumulative in terms of all of the alcohol-related, you may call it harmless, but this was all related to alcohol. He wasn't seeing a counselor because he had a hand-washing disorder. He was seeing a counselor because he had a drinking problem. So all of that goes to the cumulative effect of all of the evidence that we're asking you about. Why wasn't that unduly prejudicial? You said yourself you had plenty of evidence to show that the guy was drunk. I mean, you had your own expert, you had the testimony of Keith Murphy, the sobriety test which he had failed and all of those things. So why pile on this other stuff? Well, I think that goes to the lack of prejudice. And I wouldn't hesitate to use the term overwhelming in terms of the evidence of his guilt in this case. It was overwhelming. So then if it's overwhelming and the state had enough, that's my question, why throw in the kitchen sink as well? Well, I guess it goes to the issue of at what point does the trial court have to sanitize a defendant's confession? Simply because the evidence is overwhelming, the determination of a fair trial is not whether... Just a moment, counsel. The trial court is there to make sure that the trial is fair, and I wouldn't call it sanitizing. The trial court has a responsibility to make sure that the trial is conducted in a fair and just manner. So simply because you want to put the evidence in doesn't necessarily mean the trial court has to go along with that. So don't use the word sanitize in this context because I think it's misplaced. Okay. I guess what I would say then is that in terms of the prejudice, and Justice Hoffman brought this up, unduly prejudicial. Well, what the case law speaks to on that point is that it would cause the trier of fact to decide on an improper issue, indignation, horror, and cause the jury to convict the defendant based on these other arguably tangential or irrelevant issues. And that's simply, I don't think a serious argument can be made that that's even remotely possible in this case. In light of the overwhelming evidence beyond those things. You don't think a jury listening to this evidence could turn around and say, the guy's a drunk. He's got a history of being a drunk. He was obviously drunk that morning. Drinks all the time. That would require the jury to ignore all the other evidence that they heard. Ignore what? The evidence. He wasn't. He had a blow. You had an expert to say that their expert, and his extrapolation was fantasized. My question is, when you put in this type of evidence, do you get a jury convicting him just because he's drunk? Must have done it today. Did it in the past. That would require the jury to ignore that on this date, out of those witnesses' mouths, he blew a .104. That he had an odor of alcohol. He was flunking all these field sobriety tests. The witnesses on the scene testified that he careened across two lanes and blew through the intersection. Slammed into the motorcycle. And through his own mouth, he admitted that that morning on an empty stomach, got up and chugged nearly half a bottle of vodka. All of that is fine. That's not what we're asking you about. We're asking you about the other stuff that didn't happen that day. I guess the reason I mention all that, and maybe I shouldn't repeat it, is to show that that was all the evidence that the jury clearly focused on in convicting this. How do you know that? You gave them this other stuff, too. You weren't in the jury room. You don't know what they focused on? I guess I'm arguing. I'm arguing that this is something that a reasonable jury, a rational trier of fact, would not latch on to and say, yes, we must convict this defendant because he has an AA counseling. I don't think a serious argument can be made to that, that that's why this, ignoring all the other evidence. Well, your opponent begs to differ, counsel. He says that that is exactly what they latched on to, and that was why it was improper to allow that evidence in. I guess if I could just say on that point, there are, and this wasn't, and I would in no way concede that this was considered other crimes evidence, or even remotely in that arena. No, it's not other crimes evidence. It's propensity. But if there are cases where the defendant is charged with murder, and under other crimes evidence, a prior murder or a robbery is allowed into evidence, and then a very good argument can be made that propensity, that was arguably introduced or relied upon by a jury for propensity. This doesn't come within a New York model of that. This is not a prior crime. This isn't a prior bad act. It's tangential. At best, it's tangential. And it's certainly, I cannot say that. And you don't think that it in any way buttressed the state's case? It was not unduly prejudicial. Now, that wasn't my question. I'd like you to answer the question. I know I would disagree. I would respectfully disagree with this. So you don't think it buttressed the state's case in any way? Which particular? The evidence that the defendant objected to being let in because it was highly prejudicial and irrelevant. That was their argument. That's what they said in their motion in Lemonade. Counsel now claims that he argued that it was character evidence when he was before the court. I didn't see that in the record, but he argued that it was irrelevant and prejudicial. That's the evidence. You're saying it in no way buttressed the state's case. Is that your position? No, Your Honor. I beg your pardon. I'm not saying that. I'm saying that it potentially did buttress the state's case. And it corroborated our own expert. And it corroborated the chief of police's testimony. I'm saying there's a very good chance. And you think that that's appropriate, that it's okay to allow that evidence in to buttress your case. Is that your position? Yes, absolutely. This is the defendant's confession. He's admitting to his drinking habits. No, no, I'm not talking about the defendant's confession. I'm talking about the parts. You're lumping everything together, counsel. I just want you to answer the little narrow questions that I'm asking. What they objected to in terms of the portion, the redaction that they asked for that they did not get, that's what I'm talking about. Okay, but with all due respect, there were five of them. There were five separate ones. I guess I'm not clear which particular. I've only asked questions. They listed five. I'm only interested in one. The drinking. One. The drinking. The rest of them are. You've got a harmless error argument on all the other four. I'm worried about that one. Okay. Well, I guess it is the defendant's confession. Again, it is the defendant's talking about his drinking habits. And bear in mind that that did involve his drinking habits, including and intertwined with what he was doing that morning when they asked him about the bottle and where's the bottle right now. You always drink vodka. Yes, it's my only drink. It's all interwoven. And I guess that because it's a statement of a party opponent, and whether or not this was unduly prejudicial, it's not whether or not it was prejudicial, it's whether or not it was unduly prejudicial, and there's a huge distinction. So for those reasons, we would ask if the court would allow it, I'd like to discuss the other. Very briefly, counsel. Actually, no, I think it's been covered. For all those reasons, for all those stated in our written brief, we would ask this court to affirm the defendant's convictions as well as his sentence. Thank you. Brief rebuttal, please. I would amplify the fact that this functional alcoholic evidence, that there is no linkup, that there was no connection, and it's worse than just propensity, or it's worse than just character evidence. It's worse than the way it was made out in the rebuttal clause. They explicitly argued the fact that he's an alcoholic, that he's got priors, that he has experience with these things. Their explicit rebuttal argument was, we don't tolerate our families being killed by some alcoholic. Don't let this guy out of here. You started your argument, your first argument, telling us, before we start interrupting you and asking you questions, that the first thing out of your mouth was that the statement from one of the police officers, there's no probable cause, no smell of alcohol, all that good. That's how you began your argument today, because you wanted to point us to the fact that there was a great deal of evidence that he was not drunk when the event occurred. On the quash motion, that there's no probable cause while they're holding him at that moment, before the chief arrives and says that he suddenly smells alcohol that no one else can smell, that he notices glassy eyes when other people had noticed that he had been crying, the things that the chief attributes to signs of alcohol. So was this evidence introduced to rebut that evidence? No. This functional alcoholic evidence wasn't, and it's not. And that's what the state's argument is, but that is incorrect. And a review of their arguments, a review of how they used the evidence, when they used it shows, and the fact that they specifically asked in this interrogation session. He didn't just volunteer that he was an alcoholic. They specifically said, so, man-to-man, tell us about your alcohol problem. If I can get to this functional alcoholic. The problem is not what they asked him when they questioned him, but rather the evidence that was introduced in front of the juror. Their argument is the evidence that was introduced had relevance, and the relevance was that there was testimony that a number of police officers observed him and believed he was not drunk. This is evidence to rebut that. It doesn't rebut it, and it is a generalized concept. This is what they presented, that, quote, functional alcoholics, a term that Mr. Elmore didn't use, and it doesn't have any kind of medical definition. Did the expert use it? The expert used it, yes. He said functional alcoholics. The problem is that all alcoholics, the concept that functional alcoholics. I'm not talking about science or psychology. I'm talking about legal issues. I'm talking about admissibility of evidence. So three officers said he didn't appear to be drunk. That's the issue in the case. As to the question, I'll say yes. Okay. And then the state introduces evidence that he drinks a great deal all the time, and then they introduce an expert that says someone who drinks a great deal can, in fact, mask that and can mask that. He says that someone who is a functional alcoholic, quote, unquote, is possible that that person can mask their behavior. I would point out two things. Number one, their suggestion is he masked the behavior when his BAC was far, far higher than it was later. Well, my point is it's not admissible because it's completely unsupported. The evidence that they got from the statements of Mr. Elmore is not that he's capable of drinking alcohol and passing field tests. He didn't say that. There's no evidence to support that. Their expert said functional alcoholics can do this. There's no linkage between Mr. Elmore and this prototypical functional alcoholic. And the underpinning of that — If it was, then there would be some evidence, but the police lost his testimony. If there was evidence that Mr. Elmore's medical — that his physiology had been altered because of his alcoholism, because of the way he drinks, the tolerance, that's all based on this concept of medical tolerance, which doesn't apply to alcoholics in general. There's no evidence how Mr. Elmore drinks. There's no evidence that he — There's no evidence as to how much he drinks? I thought that was what we were discussing here. No, there's no sufficient evidence to support this concept that he's a functional alcoholic. Did you object to the testimony of the expert? Yes. They objected to the term functional alcoholic. They objected to it when the chief was asked it. The chief was asked it long before.  Yes. What was the basis of your objection to the expert's testimony? That there's no evidence to support this claim that, number one, that Mr. Elmore is a, quote, functional alcoholic, or, second, that there's any medical or other basis for this theory that all alcoholics have a tolerance to alcohol that is increased. That is completely false, and everyone's common experience with different kinds of alcoholics, I think, reveals that. You're still losing me because I'm still thinking about it. So there was an expert that testified to that? There's an expert who used that term over objection, yes. And over this defense's strenuous objection that the state not be able to interject this functional alcoholic. It's the alcoholic problem. Because of the relevance problem. Yes, and the fact that... Not because of his expertise or his opinion. I would have to... I can't say... I know for sure the argument was being made that this was not relevant and there was no evidence to support it. Lack of relevance based on lack of foundation. The argument was that there was no evidence to support it and that there was no relevance to claiming... Is that a foundational objection? I don't think they used the term foundation. It could be a foundational objection, yes. But I think that their specific argument was that none of this material should be put in front of the jury. It is worse than counsel... Can I ask one last question? Assuming that we agree with you. There was other evidence, including the blow that was introduced. Why does it sound harmless there? Because this is not a close... This is not a case that is just so overwhelming. We have two experts who differ in the question of what was his BAC at the time he was driving. We have retrograde extrapolation being used here. And there is a difference... For those of us... Would his patterns in drinking affect either one of those experts' testimonies to that point? No. This is the problem. No, there was no evidence of that. Had they had some medical evidence that because of his condition, his medical condition, that his absorption or his elimination, both of which are affected arguably, had been altered by the effects of his alcoholism, then I suppose theoretically with that level of expert evidence you might be able to argue that somehow this actually does rebut. But I would also point out that there was dispute over how much alcohol was consumed. It is not... It is undisputed that Mr. Ulmer admitted he drank alcohol that morning. The state says he drank an entire bottle. Mr. Ulmer says... Counsel, he testified that he hadn't eaten since 6.30 or 7.00 p.m. the night before he drank. It varies, but we know he drank at least nine ounces... At the quash motion, yes. ...of alcohol that morning on an empty stomach. I don't want to confuse trial evidence with quash motion evidence because the two obviously, there's no overlap because that evidence wasn't before the jury. But he does say there is a dispute over how much of that bottle he drank that morning right before driving. And the argument between the experts was where does this bell curve set up? Is it on the way up? Does he just consume that alcohol? He's ten minutes from home when this accident happens, or ten miles from home. Is he still going up? And then he peaks while he's in that police station and he's on the way back down and at .10, what, three and a half hours, three and a quarter hours later? It wasn't an hour and a half. It was three and a quarter hours later. Or was he immediately in the twos, up above .20, as the state's expert says, and then gradually slides down, not taking into consideration this concept that if he's an alcoholic and tolerance and absorption. Can you say not taking into, but the experts said that that evidence was not relevant to their determination? Yeah, they used the term. They used the term functional alcoholic. Oh, you're confusing me. You're confusing me. Here's my question. We're back to is this evidence relevant? You're telling us that the key evidence in this case was the conflict of the experts, and the experts both talked about their opinions as to how alcohol would function in someone's system, correct? Right. They're using the theoretical person that eliminates at .10 an hour and that consuming a certain amount of alcohol at a certain weight that you go up, rise at a certain level. So did they factor in the kind of testimony that he presented about his history of drinking? No. Into the absorption and elimination? No. No. It was solely based on the state's excuse for why it was that he passed fields, why no one could smell alcohol. Why no one. That is all it was. So you're telling me neither one of the experts said anything about how absorption rate may vary depending on the person? Oh, they did testify that there was variance. Including if they're drinking history. They did testify that there was variance, yes, but there's no linkage. So why isn't this relevant? Because there's no linkage to Mr. Omer's drink. The evidence that they have that they try to introduce this with is completely and totally insufficient. It does not support the expert's opinion. It doesn't support the argument. And more importantly, it's the use of this term alcoholic. The state is wrong when they say, oh, this is not as bad as admitting a conviction in violation of Montgomery. It's worse. It's admitting that he has an uncontrollable disease that stops him from being able to drink. That's the problem. That's why this is unacceptable. He says, every day of my life I drank a bottle of vodka. And then one expert takes a stand and says, a person who drinks a bottle of vodka every day absorbs this way, and the other guy stands up and says, a person who drinks a bottle of vodka every day absorbs that way. That would be relevant, would it not? And if there was testimony, I think, frankly, that there is no scientific basis for that at all. And had that been offered, it wouldn't. But that's not what was offered. That's one expert versus another. Right, and that's also not what was offered. I'm arguing that it is not a case that is so overwhelming that this kind of error could be harmless, especially when it was so aggressively harped on through the case and all through rebuttal closing. The suggestion to this jury is that he's done it before, he's got experience. Why constantly refer to him as experienced? Why say he knows how to refuse to give blood? Their intention was to interject in front of the jury that he's an alcoholic. They found a creative way to use it. But the problem is the linkage isn't there. It's not sufficient, and it does not rebut the evidence that he was passing through. Was there something redacted from his statement? There was redacted the fact that he had prior DUIs. But none of the information that would lead any normal juror sitting there to realize and understand. He had prior DUIs. What else is it when you say he knows how to refuse to give blood? He knows how to refuse to deny? They stay arguing he knew how to put his feet outside the car so that the officer couldn't smell him. Their explicit argument to the jury is that he has priors. There's just no two ways around it. And they did it in, you know, our position is because there was a close question on the intoxication. Because they didn't have evidence of what his behavior was like that supported it when he drove. Because they didn't have a blow close in time. You don't usually have three and a half hours between them. And worse, it's a breath. And so we have extrapolation, and then we have this theorizing about what a functional alcoholic, not Mr. Homer, but what a general functional alcoholic might behave as or how that person might act. All right, without further, I think that the court should reverse the case for a new trial. Thank you very much.